## Case No. 16,046.

UNITED STATES v. PICO et al.

[Hoff. Land Cas. 172.] [1]

District Court, N. D. California. Dec. Term, 1856.

MEXICAN LAND CLAIM.

This claim not contested by the United States.

[Claim of Maria Antonia Pico to the Rancho Punta del Año Nuevo embracing four leagues of land in Santa Cruz county. The board confirmed the claim, and the United States has appealed.]

William Blanding, U. S. Atty.

Stanly & King, for appellees.

## Case No. 16,047.

UNITED STATES v. PICO et al.

[Hoff. Op. 412.]

District Court, N. D. California. June 30, 1859.

MEXICAN LAND GRANTS—EVIDENCE TO ESTABLISH.

[An alleged grant of certain mission property in 1846 rejected, where the only evidence thereof was the original grant, together with a letter of the governor and a receipt for part of the purchase money; unsupported by any evidence whatever from the archives, or any evidence of assertion of title prior to the conquest, or of any knowledge of the existence of the grant by parties likely to know of it if it had in fact been made; there being also intrinsic and other evidence that the papers relied on were fabricated after the conquest.]

[1] [Reported by Numa Hubert, Esq., and here-reprinted by permission.]

HOFFMAN, District Judge. The claim in this case was confirmed by the board, and it is submitted to this court on substantially the same evidence as that on which it was decided by the commissioners.[1] The original grant by Pio Pico, dated May 5, 1846, is produced, and its genuineness testified to by Pio Pico himself. The claimants have also produced an original communication from the minister of war and marine, dated March 10, 1846, to Pio Pico, which the latter alleges he received prior to making the grant in this case, and which contains, as he states, the authority under which he acted. There is also produced a receipt from Gov. Pico for $6,000, on account of the $12,000 for which the mission was sold; and one from Gen. Jose Castro for a like sum—the first dated May 15, 1846, the last July 28th of the same year. The claimants have also produced a document signed by Pio Pico, in which he recites an order from himself to the father president of the missions of the north, and dated May 5, 1846. In this order the governor informs the father that the government, in view of the urgent necessities of the nation, as communicated in the official note of the minister of war and marine of the 10th March, 1846, and pursuant to the decree of the departmental assembly of April 13, 1846, had sold the mission of San Jose, with all its lands, real and personal property, and other existing moveables, to Andres Pico and Juan B. Alvarado. The governor therefore directs the president to cause the said establishment to be delivered up without hindrance, reserving the parsonage house and ground pertaining to it for the use of the reverend father missionary. The claimants have also filed a certificate or statement made by Friar Jose Maria del Refugio Suares del Real, dated December 24, 1849, setting forth that Don Andres Pico had presented to him a deed of sale of the mission of San Jose, dated May 5, 1846, whereby the governor constituted the said Andres Pico and Juan B. Alvarado owners of the arable lands, and dwelling houses, recognized as belonging to the mission, which up to that time had been under his administration and tutorship; that in pursuance of said deed, as well as an order previously received from the governor to deliver said property to its owners, he went in person to the mission, and on the 22d November, then last past, made a formal and solemn delivery of the appurtenances of said establishment, except the church, cemetery, priest's house and adjoining huerta, to Don Andres Pico, who took possession, etc. There is also filed a petition addressed to Antonio Maria Pico, dated January 2, 1850, asking that the judicial possession of the lands, etc., ordered to be given, to which is attached the record of an act of judicial possession, made in pursuance of the petition, by H. C. Smith, alcalde, on the 18th, 19th, and 20th of February, 1850. The above, with certain agreements, mesne conveyances, etc., includes all the documentary evidence exhibited in the case on the part of the claimants.

It has frequently been remarked by this court that the only reliable evidence which can be offered in support of a grant is that furnished by documents found among the archives of the former government, and that afforded by showing an occupation, or at least a notorious assertion of title, before the acquisition of the country by the Americans. In the case at bar no one of the documents exhibited is found among the archives. The proofs of title rest, as has been seen, exclusively on the grantor deed of sale by Pio Pico, the genuineness of which is sworn to by that officer; and on two receipts, the authenticity of which is proved in a similar manner. The certificate of Padre Real is not only inadmissible in evidence as being nothing more than the unsworn statement in writing of a person not examined as a witness, but it is dated December 24, 1849, long after the treaty by which California was acquired, and about the time at which it is contended on the part of the United States the documents now produced were fabricated, and at which, as will hereafter be seen, the claim of the appellees was for the first time heard of.

The original order addressed to the father president of the missions is not produced. It is recited in a letter addressed to Andres Pico and Juan B. Alvarado by Gov. Pico, and dated May 5, 1846, the very day on which the grant purports to have been made. The grant itself contains at the foot the usual note or memorandum that a note of it has been taken in the corresponding book. No such note can be found. Among all the records, correspondence, and other papers in the archives, no reference or allusion to, nor any trace whatever of, this transaction appears. The order to the president of the missions was undoubtedly, if it was given, an official letter, a copy or borrador of which would have been preserved; and it is almost impossible that the draft of the letter to Andres Pico and Alvarado, in which that order is recited, would not also have been found among the archives. The sale of so considerable a property was an important transaction, which it is equally difficult to conceive to have occurred without some preliminary proceedings, traces of or allusions to which would exist among the official transactions of the former government; and the receipt by the government of so very considerable an amount as $12,000, $11,000 of which was in cash, would almost certainly have somewhere been evidenced by the records. The grant or deed of sale purports to convey to the vendees "the establishment or mission of San Jose, with all its lands, real

and personal property, and other existing moveables, according to the inventory made by the commission appointed by this government." No such inventory appears in this case. It ought, if ever made, to be found in the archives.

In the case of U. S. v. Cambuston [20 How. (61 U. S.) 64] the supreme court, after alluding to the entire absence in that case of any documentary evidence of title of record, or found among the archives, says: "We think, for the reasons above stated, that the case in the court below was too defective to have warranted a confirmation of the title to the claimant as it was unsupported by the evidence; and also for the further reason that, for aught that appears in the proofs, the alleged grant has never been recorded in the proper book, or, indeed, in any book of the Spanish records. This is expressly required by the regulations of November, 1828, and enjoined in the grant itself. The record should have been produced, or its nonproduction reasonably accounted for."

It is urged that in this case (which is claimed to have been a sale, and not a grant) the governor did not act under the colonization laws, but under some authority conferred on him by the departmental assembly, or by the circular of Tornel, minister of war and marine of the republic of Mexico. But the grant itself recites that it is made in conformity with the law of August, 1824, and the regulations of 1828; and the memorandum at the end states that a note has been taken of it in the corresponding book. The nonproduction of this book is not in this case accounted for, but it is known to the court that the book of "Tomas de Razon," as it is commonly called, for the period at which this grant was made, is not found in the archives. The absence of any note of the grant is not, therefore, of itself a suspicious circumstance; but the entire absence of any trace or allusion to the grant in any report, correspondence, order, or other document in the archives, is a circumstance which to any one acquainted with the official habits of the former government, is pregnant with suspicion. If this grant be deemed to have been made under the colonization laws, the case of U. S. v. Cambuston [supra] is a decisive authority for the rejection of the claim; and even if it be deemed not to have been made under those laws, the observations of the supreme court in the case referred to, clearly inculcate the principle that in all cases evidence of some kind from the archives should be rigorously exacted, or its absence reasonably accounted for. But the evidence of occupation or the assertion of title under the former government is equally unsatisfactory. The only testimony which even tends to show that Andres Pico and Alvarado ever asserted any title to the mission before the end of 1849, or beginning of 1850, is that of Antonio Maria Pico and Joaquin Castro.

The first of these witnesses swears that he gave to Andres Pico and Alvarado possession of a garden, but under what title he does not recollect. It was done (he says) under an order of the governor, which he believes is among the papers. But, in the first place, no such order is produced; and, secondly, this possession was given, according to Antonio Maria Pico, in 1844, two years before the date of the grant now relied on. Joaquin Castro swears that certain debts due by the mission were paid by Andres Pico and Alvarado. The payment of those debts was one of the duties imposed on the grantees in the grant itself. Unfortunately, however, it appears by Castro's own statement that the 900 fanegas of wheat which the mission owed to Jesus Vallejo were paid by Andres Pico in 1850, and that he was told by Antonio Maria Pico in 1850 or 1851 that one hundred dollars which the mission owed him had been paid. When, he does not state, nor does Antonio Maria Pico himself, though he was examined as a witness for the claimants.

But there is more decisive proof that no title to the mission could have been asserted by the claimants until long after the change of flags. In the letter of Pio Pico to his brother and Alvarado he recites the order which, as he says, he had on that day (May 5, 1846) given to the father president of the missions for the transfer of the property to the vendees. It has already been observed that the original of this order is not produced, nor is the office copy found among the archives. If it had been issued, it is impossible to suppose that the vendees would not at once have insisted on its execution. The buildings, orchards, etc., of the mission were valuable and productive; and yet during the whole period from the date of the sale and of the order to the father president (May 5, 1846) up to at least the end of 1849, the mission lands and buildings were suffered by the vendees to remain in the possession and under the control of Padre Real and of the father president. Adolfo Carrenos testifies that in October or November, 1847, he took possession of an orchard of the mission by order of the padre, and that he kept possession thereof until January, 1849, when he surrendered it to a Mr. Bolcoff, by direction of the same priest. During all this time he, the witness, divided the produce of the orchard with the padre according to agreement. The same witness also states that after Bolcoff had remained in possession some months he agreed to surrender the land in consideration of the sum of $1,000, to be paid him by the priest. He also testifies that he never knew of Andres Pico asserting a claim to the mission lands until 1850, when he was told by Padre Real that certain persons occupying rooms in the mission must have an understanding with Andres Pico, as he had a title to the whole mission. He also adds that if such a claim

had been asserted before 1850, he would probably have heard of it from the padre, with whom he was on terms of intimacy; and he states, on cross-examination, that previous to 1850 Padre Real rented some of the buildings, corrals, and portions of the lands to different persons, and that he (the witness) was employed by the padre to collect some of the rents. It is also shown on the part of the United States, by the record of a suit commenced by Padre Real against E. L. Beard, to recover possession of a portion of the land, that on the 17th July, 1849, Padre Real and the father president of the missions executed a lease of the mission lands to John B. Steinberger for the term of five years for the sum of $22,000. It was claimed by Padre Real in this suit that Beard entered under Steinberger. This Beard denied, but averred that he had entered on the premises as vacant public lands of the United States. The suit seems to have been prosecuted until November, 1850, when it was dismissed by consent; Beard having by that time acquired an interest under the alleged grant to Pico and Alvarado.

It would seem clear from these facts, not only that the alleged grantees for more than three years suffered Padre Real to deal with and use the property for his own benefit, without asserting either to him or his tenants their own title, but also that no order to deliver the possession to the vendees could have been issued by the governor to the father president on the 5th May, 1846. That he and Padre Real should, notwithstanding an official notification of the sale to Pico and Alvarado, and notwithstanding the positive order to deliver possession to them, have ventured to make a lease of the lands three years afterwards, is in the highest degree improbable. More especially, as by the lease it is expressly stipulated that the lessors should on no account be responsible in case the government of the United States or of the territory of California should annul the contract while no mention whatever is made of the far more probable contingency (if the facts averred by the claimants are true) that the real owners of the land might assert their title to it. I cannot but consider that if this lease was executed by Padre Real and the president of the missions, as alleged in the complaint of the former, we are justified in inferring that at that time they could not have heard of the sale of the mission to the present claimants; and that they could not have received three years before an order from the governor to surrender the possession—an inference strongly corroborated, as we have seen by the testimony of Carneros, and by the absence of all positive testimony as to the assertion of title by the claimants up to the end of 1849, except the statement of Antonio Maria Pico that he heard of the sale before 1848. Had this claim been asserted during the years 1846, 1847, 1848, and 1849, it is impossible that it should not have been heard of by some of the persons who occupied or desired to possess the buildings, orchards, gardens and fertile lands pertaining to the mission as well as the priest and the father president. But no such evidence, except the loose statement of Antonio Maria Pico, has been produced, and the court is authorized to assume that a fact so susceptible of proof, and which is not proved, does not exist. But if it be in a high degree improbable that the father president would, after being notified of the sale and ordered to deliver the possession, have made the lease referred to, it is still more improbable that the vendees, who had paid in cash so large a sum as $11,000, in current money, and obtained on the very day on which the sale was made an order for the immediate delivery of the possession, would, for three years and a half, have wholly neglected to avail themselves of the rights they had acquired; during all which time the padre continued in possession, and rented the land, buildings, etc., while their own title remained unasserted, and even unknown, so far as it appears, to any one but Antonio Maria Pico.

It thus appears, not only that the archives fail to furnish the slightest evidence in favor of this claim, but, that the absence of all allusion to or trace of its existence affords a strong presumption against its genuineness; and, secondly, that it is not only unsustained by any proof of the assertion of title prior to the conquest of the country, but its existence was unknown to parties who, if the papers are not antedated, could not have been ignorant of it, and it remained unasserted under circumstances, and for a length of time, which render the silence and neglect of the alleged grantees almost incredible. But there are other circumstances which tend to strengthen our suspicions as to the genuineness of this title. The receipt of $6,000, dated May 15, 1846, and the letter of Pio Pico in which he recites his order to the father president, dated May 5, 1846, are signed by Pio Pico in the mode now used by him, as it appears by the signature attached to the deposition. A slight examination of the archives shows that this mode of signature is unmistakeably different in the shape of the letter "P," which is the initial letter of both his names, from that uniformly adopted by him at the period when this grant purports to have been issued. On the very day when the documents we are considering are dated,—i. e. on the 5th and 15th May, 1846,—his signature appears on the departmental assembly records and other documents of undoubted authenticity, exhibiting its characteristic peculiarities and wholly dissimilar in the form of the letter referred to, to that appended to the document in this case. Nor is this all. The signature to the grant or deed of sale has evidently been altered. It is obvious on inspection that both the "P's" were

originally written in the form used by him at the date of the grant, but those letters have since been altered so as to make them conform in shape to the signatures on the two other documents bearing his signature exhibited by the claimants.

This alteration is wholly unexplained. It suggests the suspicion that the deed of sale may have been made perhaps before the flight of Pico from California in 1846, when he would naturally have adopted the mode of signature then used by him; but the parties, perceiving that such a sale would be of no validity unless the consideration had been paid, and unless proved by some other evidence than the bare production of the title itself, have more recently, probably in 1849 or 1850, procured the ex-governor to sign the receipt and the letter ordering the mission to be delivered to the vendees. In signing these last, Pio Pico has inadvertently used his later mode of signature; and the parties, not willing that the papers should show him to have signed his name in two different ways on the same day, have altered his first signature to correspond with his last. Whatever probability there may be in this conjecture, the fact remains that the first signature has obviously been altered; and that the two others are similar to that attached to his deposition, but different from that officially used by him not only before and after the time at which the documents purport to have been signed, but on the very days on which they are dated.

Secondly. In the case of Larkin v. U. S. [Case No. 8,091], this court had occasion to review at length the legislation and policy of the Mexican government with regard to the missions of California. It was in that case considered that the order of the supreme government signed "Montesdioca," and dated November 14, 1845, which directed Pio Pico to suspend all proceedings relative to the sale of the property pertaining to the missions, applied to the buildings, orchards, gardens and other improved property which had been created by the industry of the missionaries and the Indians under their charge, but that it probably was not intended to deprive the governor of his general power of granting, under the colonization laws, the extensive tracts of vacant and entirely unimproved land which may at one time have pertained to those establishments.

The deed of sale in the case at bar includes not only the lands of the mission, but "all its property, real and personal, and other existing moveables, according to an inventory, etc., excepting only the priest's house, consisting of six rooms, with the ground thereto belonging." This order of Montesdioca was presented to the departmental assembly on the 15th April, 1846, two days after the alleged session of the 13th April, at which the grant in this case recites the power to sell the mission was given by that body to the governor. The sale was thus in open and flagrant violation of the peremptory order the governor had received less than three weeks before. That he should have so acted seems highly improbable.

Thirdly. The decree or resolution of the assembly to which the governor refers in his grant as having been passed on the 13th April, 1846, is not found among the proceedings of that body. On the contrary, it appears from their journals that the assembly met on the 30th March, and again on the 15th April; but there appears to have been no session during the interval. This mistake of Governor Pico might well have been made if the grant had beeen written after the lapse of a considerable time, and when he had no longer access to the archives. It could hardly have occurred within about three weeks of the supposed session, and when the governor himself had, two days after the supposed session, comunicated to the assembly the order he had received to suspend all further proceedings relative to the sale of the missions.

Fourthly. We have seen that the only sources of power to which the governor refers in the grant are the decree of the assembly of April 13th, 1846, and the colonization law of 1824 and the regulations of 1828. In his letter to the president of the missions, dated on the same day, as also in his deposition, he states that he also derived his power from a communication of the minister of war and marine, dated March 10th, 1856. We have also seen that there was no decree of the departmental assembly of the 13th of April, 1846, nor was there any session of that body on that day.

In the case of Larkin v. U. S., before referred to, it was observed by this court that the communication from the minister of war and marine "appears to be a circular addressed to the commandant-general of California, amongst other functionaries. All of it except the address is marked as a quotation, and its object seems to have been to stimulate the public authorities to a vigorous defense of the national territory and the maintenance of the national honor. The only clause by which any authority to sell the missions can be deemed to have been conferred on the governor is that in which it is stated that the supreme government expects from your loyalty and patriotism that you will dispose such measures as you may judge most suitable for the defense of the department, for which object ample power is granted to you and Senor the governor. It is evident that the power here conferred was given to the commandant-general as amply as to the governor. It can hardly be pretended that under it the commandant-general could have sold the vineyards and orchards of the missions to whomsoever and at whatsoever price he chose. It appears to me that the object of this circular was

merely to authorize and direct the general commanding to take the proper military measures for the defense of the country, and that, had it been intended to revoke or modify the order signed 'Montesdioca,' prohibiting the sale of the mission property, and which was issued only three months previously, that object would have been unequivocally expressed, and the governor directed to make sales of that property to procure resources for the war. The board of commissioners were unanimously of the opinion that this circular conferred no power to make the sale at bar, and in that opinion I concur." But supposing that Governor Pico considered that this circular did confer upon him the power to sell the missions, it is a little remarkable that he did not refer to it in the grant itself when alluding to the decree of the assembly of the 13th April, and especially when he is at pains to set forth the circular in his letter to the father president, dated on the same day as the grant. But it is still more surprising that the circular should at the date of that letter (May 5th) been received by him. The circular is dated at Mexico on the 10th March, 1846. The communication of Castillo Lanzas, addressed to the local authorities, and advising them of the approach of war, is dated on the 13th March, 1846. It does not appear to have reached California until about July 4th of the same year. The Montesdioca document, so often referred to, is dated November 14, 1845. It seems not to have been received until about April 15, 1846. It is therefore a remarkable circumstance that the Tornel circular, dated March 10th, should have reached California in the beginning of May, and been acted on by the governor on the 5th May; while another circular, equally important, and dated only three days afterwards, did not reach the government until two months subsequently. If to these considerations we add the fact that Moreno, the secretary, has not been called as a witness, although the grant is signed by him and is in his handwriting, and the circumstance that the amount alleged to have been paid in cash, viz., $11,000, is a sum which few Californians would at that time have been able to command or willing to devote to such a purchase, we are justified in saying that all the circumstances connected with this claim confirm the suspicions which the entire absence of evidence from the archives, or of proof of occupation or assertion of title prior to 1849, unavoidably excite.

I have not thought it fit to put the decision of this case on the ground of want of power in the governor to make the sale; though, as already decided by this court, I think that his power to grant mission property was confined to granting the vacant and unoccupied land adjacent to those establishments, and did not extend to the buildings, orchards, vineyards, etc., which the

order of Montesdioca had expressly prohibited him from selling. I think, for the reasons above given, that in the language of the supreme court already quoted, "the case is too defective to warrant a confirmation of the title to the defendant, as it is unsupported by the evidence." The claim must therefore be rejected.